Neel, Stephen E., J.
Plaintiff Midland Hotel Corp. and third-party defendant Manfeld Hotel Enterprises (together, Midland) move for summary judgment against defendant Preferred Motor Inns of New England, Inc. (Preferred), seeking a declaration of their entitlement to a $500,000 deposit paid into escrow by Preferred as buyer under a purchase and sale agreement. Preferred moves for summary judgment on its counterclaim and third-party claims, seeking return of its deposit. For the reasons set forth below, Midland’s motion will be allowed, and Preferred’s motion will be denied.
BACKGROUND
The summary judgment record reveals the following undisputed facts. On July 25, 2007, Midland and Manfeld, as sellers, and Preferred, as buyer, entered into an Agreement for the Purchase and Sale of Hotels (Agreement), pursuant to which Preferred was to purchase three Massachusetts Holiday Inn hotels. As required by the Agreement, Preferred deposited $500,000 with Stewart Title Guaranty Company as escrow agent.
The Agreement includes two provisions at issue in this case. Section 3.3, captioned “Objections to Title or Survey,” states in part:
If the Commitment[1] or Survey[2] reflects that Sellers’ title: (a) is not good, marketable and insurable, in Buyer’s reasonable opinion, (b) contains exceptions to title other than the Permitted Exceptions, or (c) discloses any encroachments, overlaps, easements or rights-of-way, or any other title matter not approved by Buyer in its commercially reasonable discretion which materially and adversely affect the marketability of the Property or the use thereof as a Hotel, then Buyer shall notify Sellers of any and all objections to same in writing within five (5) days of the Effective Date[3] with respect to Commitment issues and within thirty (30) days of the Effective Date for Survey matters. Any such objection by Buyer shall be deemed a “Title Defect.” . . .
Sellers shall have fifteen (15) days after receipt of Buyer’s notice of a Title Defect to cure same to the reasonable satisfaction of Buyer ... If Sellers shall fail or refuse to comply with such requirement, then, at the option of Buyer, Buyer may (i) terminate this Agreement, or (ii) proceed to Closing without satisfaction of Buyer’s objection(s). Upon any such termination and cancellation of this Agreement, the Deposit, if any, shall be paid to Buyer . . . The Closing Date shall, if applicable, be extended by the amount of time required for Sellers to cure any Title Defect; provided, however, that if such Title Defect is not cured within sixty (60) days of Buyer’s notice to Sellers either party may terminate this Agreement by written notice to the other.
The last three sentences of Section 3.3 specifically address a separate document, Schedule 3.3:
Buyer has identified to Sellers the Title Defects set forth in a title letter of Buyer’s counsel, attached as Schedule 3.3. Buyer and Sellers each agree that the failure of Sellers to resolve the matters identified in Schedule 3.3 to the reasonable satisfaction of Buyer will render title to the Property unmarketable, and permit Buyer, at Buyer’s sole option, to cancel this Agreement . . . and receive the Deposit from the Escrow Agent. Buyer and Sellers shall work in good faith to resolve the Title Defects referenced in Schedule 3.3 and any others raised in the Commitment during the five (5) days following the Effective Date, within twenty (20) days of the Effective Date.
In Schedule 3.3, Preferred identifies mortgages, liens, and other title matters outstanding as to each property. In particular, Schedule 3.3 details the results of Preferred’s search of the Registry of Deeds and Registry of Probate for each hotel property. Preferred *261 revised Schedule 3.3 on July 27, 2007, when it sent Midland an email that included mark-ups and notes regarding the status of the matters outstanding in each Registry of Deeds (Revised Schedule 3.3).
Revised Schedule 3.3 states as to each property that, in order to close on the particular property, . each of the following must be discharged of record at the time of the closing : . . ." Para. 1 as to each property. Revised Schedule 3.3 then identifies the respective outstanding mortgages or liens on record.
Revised Schedule 3.3 further states, in paragraph 2 as to each property:
Buyer would be willing to enter into a purchase and sale agreement with Manfeld,[4] but would require thirty (30) days from the effective date of the purchase and sale agreement in order to further analyze the following title matters and their effect on the [ ] Premises. If the results of Buyer’s analysis are unsatisfactory, Buyer may withdraw from the purchase and receive back all deposits.
The statement is followed by a separate list of title matters of record identified by Preferred as outstanding as to each respective property.
Finally, Revised Schedule 3.3 states, in section D, that the title analysis for the three properties “does not cover matters or the effect of matters which are not now disclosed of record . . . any of which could cause title to be unmarketable and give rise to Buyer’s right to withdraw and receive back any deposit. . .”
The current dispute arises from the foregoing and from three letters from Preferred to Midland in August and September 2007. On August 17, 2007, Preferred sent Midland a letter by fax stating that “ [t]here remain outstanding Title Defects related to the Hotel Properties,” and that “(p)ursuant to Section 3.3 of the Purchase Agreement, Preferred Motor Inns of New England, Inc. is canceling the Agreement for failure to cure such Title Defects and requests a return of its Deposit from [the escrow agent] . . .” The August 17 letter did not specify which title defects Preferred relied on in canceling the Agreement.
Six days later, on August 23, 2007, Preferred sent Midland a letter by fax which included a list of ‘Title Defects” disclosed by surveys of the hotel properties. The letter concludes: “In accordance with the P&S, please let me know if Sellers intend to cure such Title Defects. In no way shall this notice letter be deemed to be a waiver of our right to a return of the Deposit based on our letter dated August 17, 2007.”
On September 12, 2007, Preferred sent a third letter by fax purporting to cancel the Agreement due to Midland’s failure, within 15 days of the August 23 letter, to cure title defects to the reasonable satisfaction of Preferred. The letter states that Preferred “is hereby canceling the Purchase Agreement and requesting the return of the Deposit, in accordance with Section 3.3.”
On September 24, 2007, Midland sent a letter to Preferred stating:
As of today, we have not received Title Commitments from the Title Company, as those terms are defined in the Agreement . . . Accordingly, the Buyer has waived any objections to title. I also point out that the Stewart Title Guaranty Company (“Stewart”) has not been requested by the Buyer to issue such a Commitment. . .
To the extent that it is Buyer’s position that the [Revised Schedule 3.3] constitutes a Commitment, please be advised that all purported Title Defects reference therein have been cured.
The letter further states that none of the items listed in Preferred’s August 23 letter materially and adversely affected the marketability of any hotel property, and therefore did not constitute “Title Defects” under the Agreement. The letter states that “your letter does not specify what actions, if any the Buyer proposed tó be undertaken with respect thereto, nor . . . has Stewart been contacted as to affirmative title insurance coverage.” Finally, the September 24 letter states that Midland was ready, willing, and able to close on October 1, 2007.
Midland filed the current lawsuit against Preferred on December 12, 2007. Count One of the Complaint seeks a declaratory judgment: Count Two alleges breach of contract as to the Purchase and Sale Agreement. Midland argues that, as a matter of law, Preferred breached the Agreement by sending a termination letter on August 17, 2007. Therefore, Midland contends, it is entitled to the deposit pursu-antto Section 13.1 of the Agreement, which states that “in the event there is a Buyer’s Default, the Deposit and any interest thereon shall be paid to and accepted by Sellers as full and liquidated damages and as Sellers’ sole and exclusive remedy.”
Preferred’s counterclaims and third-party claims (included together in Preferred’s “Answer and Counterclaim”) allege that Midland breached the Agreement, and seek a declaratory judgment. Preferred argues that, as a matter of law, Midland breached the Agreement by not curing title defects pursuant to Section 3.3., and seeks return of the deposit pursuant to that section.
DISCUSSION
Summary judgment may be granted where there are no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this *262 burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
The first question presented by the parties’ contentions is this: does the Agreement adopt a single standard under which Midland must address title defects identified by Preferred, or is there a separate standard for title defects identified in Revised Schedule 3.3? In answering this question, the Court will be guided by the parties’ Agreement, which the Court concludes contains “unambiguous terms” that maybe construed both according to their reasonable meaning, Joseph Fancese, Inc. v. DOS Concrete Serv’s., Inc., 47 Mass.App.Ct. 367, 369 (1999), and “as a whole, in a reasonable and practical way, consistent with [the Agreement’s] language, background, and purpose.” Cady v. Marcella, 49 Mass.App.Ct. 334, 338 (2000).
Midland contends, and the Court agrees, that Preferred’s August 17, 2007, letter purporting to cancel the Agreement is based on a misapplication of the 15-day cure requirement of Section 3.3 to Revised Schedule 3.3 title defects. Section 3.3 sets out separate requirements as to the parties’ rights and obligations to cure any title defects identified in Revised Schedule 3.3: the parties are required to “work in good faith to resolve the Title Defects referenced in Schedule 3.3 and any others raised in the Commitment during the five (5) days following the Effective Date, within twenty (20) days of the Effective Date [July 25, 2007].” By obligating Midland only to “work in good faith” with Preferred for that period to “resolve” the title defects set out in the Revised Schedule 3.3, the Agreement does not require that those defects be “cured” within that time. Compare the language of Section 3.3 governing Midland’s obligation with regard to title defects not identified in Revised Schedule 3.3: “Sellers shall have fifteen (15) days after receipt of Buyer’s notice of a Title Defect to cure same to the reasonable satisfaction of Buyer.”[5]
By August 17, 2007, the only list of title defects which Preferred had provided to Midland was that contained in the Revised Schedule 3.3; Preferred had not sent Midland notice of “Title Defects” based upon “Commitments” or “Surveys.” Thus, Preferred’s letter of that date purporting to cancel the Agreement pursuant to Section 3.3 (which letter in any event fails to specify the outstanding title defects upon which it is based) was necessarily based upon Midland’s failure to “cure” unspecified Revised Schedule 3.3 title defects. Where Midland had the obligation under Section 3.3 only to “work in good faith to resolve” those defects within 20 days after the Effective Date, and thereafter to resolve those defects “to the reasonable satisfaction of Buyer,” Section 3.3, Preferred’s letter of August 17 fails to state a valid basis upon which to cancel the Agreement.[6]
Midland argues that Preferred’s August 17 letter constitutes an improper termination of the Agreement, putting Preferred in material breach of the Agreement as of that date. Midland’s Memorandum, at 19. Even assuming that Preferred’s purported August 17 termination was a material breach of the Agreement, there can be no genuine dispute that Midland waived any such breach; rather, the undisputed record is that, as Preferred’s counsel acknowledged, “Midland intended to close on Monday, October 1, 2007 . . .” Midland’s Statement of Undisputed Facts, para. 25. Midland’s waiver distinguishes this case from The Providence Washington Ins. Co. v. Beck, 356 Mass. 739 (1970), and other cases upon which Midland relies.[7] Thus, the August 17, 2007 letter represents neither a valid termination of the Agreement, nor an actionable breach thereof, by Preferred.
Preferred’s August 23, 2007 letter states that surveys for each of the hotel properties had disclosed “Title Defects” listed in the letter. Midland contends that the surveys attached to the August 23, 2007 letter were not “Surveys” as defined in the Agreement, and therefore that the August 23 letter did not conform to the requirements of Section 3.3. Specifically, Midland states, at paragraph 21 of its Statement of Undisputed Facts:
The “Surveys” attached to the August 23, 2007 Letter (a) were not certified to Preferred or to Stewart [the title company]; (b) were not signed or sealed by a Massachusetts engineer; (c) were unsigned, unsealed, undated, and bore the legend “Progress Print.” . . . Also, the so-called “Survey” for the Marlborough Hotel Property did not contain the complete legal description, omitting the EASTERLY course, leaving the description “open.”
The Agreement defines “Survey,” at Ex. A-4, as a survey that, inter alia, is certified to Buyer and any other parties designated by Buyer, is prepared and sealed by a licensed surveyor or engineer in the State, and conforms to the requirements for ATLA/ACSM Land Title Surveys. Among the requirements of the latter is a certification to the client, title company, and any others designated by the client, that the survey was made in accordance with the “Minimum Standard Detail Requirements for ALTA/ASCM Land Title Surveys.”
Preferred denies Midland’s statement of facts, paragraph 21 (quoted above), but does not effectively dispute those facts. Rather, Preferred argues that Midland (1) never responded to the August 23 letter; (2) never informed Preferred that Midland did not consider the surveys attached thereto to be “Surveys” as defined by the Agreement; and (3) never informed Preferred “as to any reason why the Sellers would not respond to the letter.” Preferred concludes that “[s]uch *263 conduct is inexplicable, particularly where the letter plainly requests that the Sellers notify Preferred as to how the Sellers intend to cure the ‘areas of encroachment.’ ” Preferred’s Memorandum, at 12.
The Court concludes that Midland had no duty to respond to the August 23 letter unless that letter conformed to the requirements of Section 3.3. The question is whether the deficiencies in Preferred’s August 23 letter were material under the Agreement.
Where Section 3.3 allowed Preferred unilaterally to identify “Title Defects” and to terminate the Agreement if Midland failed to cure them, the provisions allowing Preferred to take such action are to be construed strictly, and Preferred is required to adhere strictly to them. Cf. Loitherstein v. International Business Machines Corp., 11 Mass.App.Ct. 91, 94 (1980) (where parties are sophisticated, “holding the possessor of a unilateral right of this sort [option to terminate lease early] to literal compliance with the requirement for its exercise enforces commercial certainty”).
Moreover, application of the principle enunciated in Loitherstein makes sense in this case: where the Agreement required Midland to evaluate and take specific actions in response to “Title Defects” identified by Preferred, and where the ability to close the transaction depended upon Midland’s ability to cure such defects, it is not surprising that the parties negotiated precisely the form in which notice of such defects must be given. The Court concludes, as a matter of law, that the provisions of Section 3.3 and related provisions detailing the form in which Preferred was to identify “Title Defects” are material terms of the Agreement. Consequently, the Court concludes that Preferred’s failure to satisfy those provisions is fatal to its purported termination of the Agreement, communicated in its September 12, 2007 letter and based upon Midland’s alleged failure to cure defects listed in Preferred’s August 23, 2007 letter.
Midland, in its complaint, and Preferred, in its counterclaims, each seek an award of the $500,000 deposit; neither seeks specific performance of the Agreement. Article XIII of the Agreement, “Defaults,” addresses the parties’ rights to the deposit. Section 13.1 states:
Buyer’s Default. In the event of any default by Buyer . . . , including any failure of Buyer to close this transaction that breaches the terms of this Agreement, the parties acknowledge it would be impossible to ascertain the amount of damages suffered by Seller, and therefore in the event there is a Buyer’s Default, the Deposit and any interest thereon shall be paid to and accepted by Sellers as full and liquidated damages and as Sellers’ sole and exclusive remedy . . .
Section 13.2 states:
Sellers’ Default In the event of any default by Sellers or in any other case in which Buyer is given the remedies set forth in this section . . . , Buyer shall elect, as its sole alternatives, to (a) terminate this Agreement and receive a refund of the Deposit (as qualified below in this Section 13.2), and all other rights and obligations of the Sellers and the Buyer hereunder . . . shall terminate immediately, or (b) waive its right to terminate and, instead, to proceed to Closing, or (c) to seek specific performance of the consummation of the transaction contemplated herein . . . Notwithstanding the foregoing, Buyer’s right to receive a refund of the Deposit in this Section 13.2 is qualified as follows: Buyer may receive the refund of the Deposit only if Sellers’ Default includes any one or more of the following: (x) Seller’s default is a misrepresentation or breach of a condition, covenant or warranty which has resulted in, or is foreseeably likely to result in, liabilities or diminution in value to the Buyer in excess of [$750,000], (y) the Hotels are not flagged by the Franchisor at Closing, or (z) a Title Defect exists.
There is no dispute that Preferred failed to close the transaction, and Midland has demonstrated that Preferred’s reasons therefor — i.e., Preferred’s allegations that Midland breached by failing to cure title defects referenced in the August 17 and August 23 letters — are not viable as a matter of law. Preferred’s failure to close, in the absence of a breach by Midland, thus constitutes a “Buyer’s Default.” Because Preferred has failed to establish, as it must under the last sentence ofSection 13.2, the breach by Midland which Preferred contends arose out of the alleged title defects stated in Preferred’s August 17 and 23, 2007, letters, Preferred has failed to demonstrate a “Seller’s Default.” As a matter of law, therefore, Midland is entitled to the deposit.
ORDER
For the reasons stated above, the motion for summary judgment filed by plaintiff Midland Hotel Corporation and third-party defendant Manfeld Hotel Enterprises is ALLOWED, and defendant Preferred Motor Inns of New England, Inc.’s motion for summary judgment is DENIED. Judgment shall enter accordingly. Midland is directed to submit a form of judgment, together with a motion for reasonable fees, costs, and expenses in accordance with Section 15.5 of the Agreement.

Commitments are defined in Section 3.1 of the Agreement: “Buyer shall contact Title Company promptly after the Effective Date to attempt to obtain commitments for issuance of a title insurance policy for the Property underlying each Hotel (the ‘Commitments’).”

“Survey” is defined at Exhibit A-4 as “a survey that (a) is certified to Buyer . . . , prepared and sealed by a licensed surveyor or engineer . . . , (b) conforms to the requirements for ALTA/ACSM Land Title Surveys, (c) includes those Table A items specified by Buyer, (d) is in a form sufficient for the Tide Company to issue the Title Policy . . . and (e) includes the legal description and net acreage of the Property.” “Surveys” are defined in Section 3.2 of the Agreement: “[a]fter the *264 Effective Date, Buyer may cause to be prepared surveys and legal descriptions of the Property underlying each Hotel certified to Buyer and any other parties designated by Buyer, prepared and sealed by a licensed surveyor or engineer in the State (the 'Surveys')."

The Effective Date is defined on the first page of the Agreement as July 25, 2007.

Preferred did enter such an Agreement on July 25, 2007.

For the reasons stated at Preferred’s Memorandum at 11, the Court does not agree with Midland that, in any event, Section 7.3 overrides any contrary provision of Section 3.3; the point is underscored by the lower case references to “title or survey defects” in Section 7.3, indicating that the defects defined as “Title Defect" and “Survey matters” are dealt with in Section 3.3.

he terms of Revised Schedule 3.3 confirm that Midland was not required to “cure” any defect listed therein by August 17. As noted above, Revised Schedule 3.3 provides that specified mortgages or liens of record were to be “discharged of record at the time of the closing : . . .” Para. 1 as to each property. Paragraph 2 as to each property provided that Preferred “would be willing to enter into [the Agreement], but would require thirty (30) days from the effective date of the purchase and sale agreement in order to further analyze the following [listed] title matters and their effect on the . . . Premises. If the results of Buyer’s analysis are unsatisfactory, Buyer may withdraw from the purchase and receive back all deposits.” That paragraph places no obligation on Midland to “cure” any such “title matters.” Finally, Revised Schedule 3.3 states, in section D, that the title analysis for the three properties “does not cover matters or the effect of matters which are not now disclosed of record . .. any of which could cause title to be unmarketable and give rise to Buyer’s right to withdraw and receive back any deposit. . .” — presumably a reference to the first part of Section 3.3, prescribing the manner in which Preferred is to identify such other matters to Midland, and Midland’s resulting obligations to cure.

Indeed, Beck affirms the waiver principle which the Court applies here.